IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION

| | | |
|---|---|---|
| S.T.W., | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| v. | : | **Case No. 5:20-cv-00473-CHW** |
| | : | |
| COMMISSIONER | : | |
| OF SOCIAL SECURITY, | : | **Social Security Appeal** |
| | : | |
| **Defendant.** | : | |
| _____ | : | |

## ORDER

This is a review of a final decision of the Commissioner of Social Security denying Plaintiff S.T.W.'s application for disability benefits. The parties consented to have a United States Magistrate Judge conduct all proceedings in this case, and as a result, any appeal from this judgment may be taken directly to the Eleventh Circuit Court of Appeals in the same manner as an appeal from any other judgment of the United States District Court. Because substantial evidence supports the Commissioner's decision and there were no errors in how the ALJ handled Plaintiff's case, the decision in Plaintiff's case is **AFFIRMED**.

## BACKGROUND

Plaintiff applied for Title XVI disability benefits on September 28, 2016. (Ex. B3A). She originally alleged disability beginning on July 7, 2016, (R. 112), but later amended the onset date to reflect the application date. (R. 47-48). Plaintiff alleged disability based on discoid type lupus, bulging discs, migraines, bipolar disorder, carpal tunnel syndrome,

anxiety, high blood pressure, acid reflux, gastritis, diverticulitis, cataracts, rheumatoid arthritis, low potassium, constipation, torn cartilage in both knees, sciatica, obesity, fibromyalgia, heart murmur, and schizophrenia. (R. 112). After Plaintiff's application was denied initially and on reconsideration at the state agency levels of review (Exs. B3A, B5A), Plaintiff requested further review before an administrative law judge (ALJ). The reviewing ALJ held a hearing on May 29, 2019 (R. 43-78), and then issued an unfavorable opinion on November 14, 2019. (R. 12-32). Plaintiff's request for review of that decision by the Appeals Council was denied on October 21, 2020. (R. 1-6). The case is now ripe for judicial review.  *See* 42 U.S.C. § 405(g).

## STANDARD OF REVIEW

Judicial review of a decision of the Commissioner of Social Security is limited to a determination of whether that decision is supported by substantial evidence, as well as whether the Commissioner applied the correct legal standards.  *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1178 (11th Cir. 2011).  "Substantial evidence" is defined as "more than a scintilla," and as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Id.* The Eleventh Circuit has explained that reviewing courts may not decide the facts anew, reweigh the evidence, or substitute their judgment for that of the Commissioner.  *Id.*  Rather, if the Commissioner's decision is supported by substantial evidence, the decision must be affirmed even if the evidence preponderates against it.

## EVALUATION OF DISABILITY

Social Security claimants are "disabled" if they are unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations outline a five-step sequential evaluation process for determining whether a claimant is disabled: "(1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the impairment meets or equals the severity of the specified impairments in the Listing of impairments; (4) based on a residual functional capacity ("RFC") assessment, whether the claimant can perform any of his or her past relevant work despite the impairment; and (5) whether there are significant numbers of jobs in the national economy that the claimant can perform given the claimant's RFC, age, education, and work experience." *Winschel*, 631 F.3d at 1178 (citing 20 C.F.R. §§ 404.1520(a)(4)(i)-(v); 416.920(a)(4)(i)-(v)).

## MEDICAL RECORD

The record includes treatment from Plaintiff's primary care providers, specialists, and emergency room visits, as well as consultative examinations and treating source statements.

*Medical Treatment*

Plaintiff treated at Georgia Heart Physicians from at least June 2010 until April 2015. (Ex. B1F). Plaintiff primarily received treatment for chest discomfort, hypertension,

hyperlipidemia, and obesity. (R. 385, 389). Plaintiff was unable to complete an exercise stress test in April 2015, and the notes indicated that she walked with a cane. (R. 389).

Plaintiff visited the Medical Center emergency room (ER) in December 2014 after repeatedly biting her tongue while she slept. (R. 527). Because of the potential for nocturnal seizure activity, Plaintiff was ordered to follow-up with her primary care physician. (R. 527, 530). She visited the ER in February 2015 for chest pain (R. 469) and in March 2015 for neck pain and abdominal pain after eating. (R. 441). Later in March 2015, Plaintiff again sought emergency treatment for radiating neck, arm, and back pain. (R. 517). She was given pain medications and discharged. (R. 525). Plaintiff visited the ER in July 2015 after falling and experiencing chest pain with shortness of breath for approximately two weeks. (R. 390). Testing showed nothing remarkable, and once Plaintiff was stable she was discharged home. (R. 393). A chest x-ray did show mild cervical spine degenerative changes. (R. 435).

Plaintiff visited the ER in November 2016 for complaints of knee pain. (R. 574). She explained her history of treatment for her knee pain, including that she could not afford the copays for physical therapy. (*Id*.) The physical examination revealed swelling and tenderness in both knees with a limited range of motion. (R. 575). She was prescribed prednisone and discharged home. (R. 576, 822).

In June 2017, Plaintiff sought urgent care for numbness and muscle spasms on the left side of her head and jaw, which began while she was driving. (R. 694, 696, 697). Treatment providers suspected a transient ischemic attack (TIA), so she was transferred to the ER by EMS. (R. 694, 697, 715). Once in the ER, Plaintiff also reported a severe

headache with nausea and dizziness. (R. 709). Testing was unremarkable, and a brain CT was normal. (R. 712, 724). ER physicians diagnosed Plaintiff with a complex migraine, and she was discharged home once stable. (R. 713). Notes indicated that Plaintiff walked with a cane. (R. 719).

Plaintiff also treated at the Coliseum ER. Plaintiff reported to the ER in May 2016, upon a referral from urgent care, for chest pain and shortness of breath. (R. 544, 549, 559). She was discharged the same day. (R. 554). After experiencing vomiting and diarrhea for three weeks, Plaintiff visited the ER in September 2016. (R. 507). An ultrasound of Plaintiff's gallbladder revealed gallstones but did not show dilation or inflammation. (*Id.*) After this visit, Plaintiff followed-up with Dr. Burton, her primary care physician. (Ex. B6F). She was referred to a surgeon for treatment of the gallstone. (R. 582). Plaintiff underwent outpatient surgery to remove her gallbladder in December 2016. (Ex. B9F).

Knee pain and a sore throat accompanied by a cough led to another ER visit in October 2016. (R. 536). Notes indicated that Plaintiff was using a cane. (*Id.*) In April 2017, Plaintiff visited the ER for chest pain which radiated to her left arm. (R. 1011). She disclosed back and neck pain. (R. 1012). Plaintiff had a urinary tract infection, but testing failed to show any acute reasons for her chest pain. (R. 1017-1018, 1020). Plaintiff was discharged home with instructions to follow-up with her primary doctor. (R. 1020). Plaintiff returned to the ER for knee pain again in September 2017. (R. 1004). Abdominal pain brought Plaintiff to the ER in May 2018 and November 2018. (R. 953, 972). CT scans noted diverticulosis but no other acute findings. (R. 959, 977).

In April 2017, Plaintiff visited a different primary care provider, Dr. Woods, for her yearly physical. (R. 847). A review of Plaintiff's symptoms at this visit reported no joint pain, depression, or insomnia. (*Id*.) Her physical examination was largely normal. (R. 848). Plaintiff next visited Dr. Woods in June 2017 following the suspected TIA. (R. 843). She continued to complain of a headache. (R. 843). During the physical examination, Plaintiff demonstrated a full range of motion in her neck, a full range of motion in her lower joints, and a coordinated and smooth gait. (R. 844).

In January 2018, Plaintiff saw Dr. Woods for follow-up treatment on abdominal pain and vomiting symptoms after missing an appointment in September 2017. (R. 838). Plaintiff reported continuing to treat with Dr. Burton for pain management. (*Id*.) Because of her ongoing abdominal issues and symptoms, Dr. Woods referred Plaintiff to Dr. Sedghi, a gastroenterologist. (R. 839). Plaintiff was also referred to chronic pain management. (R. 839).

Plaintiff saw Dr. Crowley at Heart of Georgia Rheumatology in October 2017 for a consultation regarding lupus and fibromyalgia. (R. 831). Plaintiff reported being initially diagnosed with lupus in 1990 and taking 20 milligrams of prednisone daily for a period of 4-5 months. (*Id*.) Plaintiff expressed frustration with the treatment of her lupus. (*Id*.) Her neurological exam was normal, but during the physical exam, Plaintiff displayed lumbar pain and tenderness, and her hands were also tender. (R. 831-832). Much of Plaintiff's pain was attributed to fibromyalgia, but lab results also indicated that Plaintiff's vitamin D3 levels were low, which could also contribute to pain. (R. 830). Dr. Crowley advised that Plaintiff did not need to continue the high doses of prednisone and recommended

incrementally decreasing the dose to 10 milligrams per day. (R. 832). Dr. Crowley also recommended that Plaintiff start an exercise program to prevent the fibromyalgia symptoms from worsening. (*Id.*) She was also referred to pain management and recommended to follow-up with an orthopedic surgeon for her back pain and radiculopathy. (*Id.*, R. 833).

Plaintiff treated at Axis Pain Center for pain management. (Ex. B24F). She returned for treatment in May 2017 after not visiting for more than two years. (R. 945). Plaintiff reported significant pain and functional limitations. (*Id.*) Plaintiff indicated that exercise, climbing stairs, walking, standing, sitting, driving, lifting, and lying down aggravated her pain. (*Id.*) Dr. Covert noted that Plaintiff had difficulty with activities of daily living, including sitting for longer than 15 minutes. (R. 949). He also described Plaintiff as being in significant discomfort. (*Id.*) During the physical examination, Plaintiff had neck and back tenderness with limited range of motion. (R. 948). Plaintiff had full range of motion for both knees, but her left knee was tender to the touch. (*Id.*) She had decreased motor strength. (R. 949). No mental or psychiatric concerns were noted. (*Id.*) Plaintiff received a steroid injection at L5-S1, which provided temporary relief. (R. 943, 949). Plaintiff visited the clinic several more times through October 2018 for pain management. (R. 875, 882, 889, 895, 902, 909, 916, 923, 934, 939). At the October 2018 appointment, Plaintiff reported that medications provided at least 50% relief to her chronic pain. (R. 875). However, she reported a recent significant increase in her pain levels. (R. 878). Her aggravating factors and functional limitations remained unchanged from those noted in May 2017. (R. 875). Plaintiff used a cane to walk. (R. 878). Plaintiff received another

injection and was counseled about the side effects of her medication. (*Id.*) Plaintiff's bloodwork was positive for opioids, and she explained that she had received an erroneous prescription from the pharmacy. (R. 879). Treatment providers cautioned Plaintiff that continued inconsistent bloodwork would mean discontinuing her narcotic medications. (*Id.*) Plaintiff was also encouraged to implement light exercise or walking on a regular basis as a part of her pain management program. (*Id.*)

Plaintiff saw Dr. Sedghi for rectal bleeding, vomiting, and abdominal pain in January 2018. (R. 864). Dr. Sedghi scheduled Plaintiff for an EGD in February 2018. (R. 865). However, the testing did not take place until June. (R.861-863). The EGD revealed that Plaintiff had a hiatal hernia and inflammatory nodule. (R. 861). The biopsies taken during the EGD confirmed moderate active chronic gastritis. (R. 862). The colonoscopy portion of the EGD was not performed because Plaintiff was not appropriately prepared. (R. 861).

Plaintiff treated at OrthoGeorgia for in July 2016 for left knee pain and suspected carpal tunnel syndrome. (R. 498). The notes reflect a history of migraines, cancer, depression, arthritis, lupus, and heart murmur. (R. 498-499). Following in-office x-rays and physical tests, Plaintiff's symptoms indicated possible left-side cervical radiculopathy, bilateral carpal tunnel syndrome, and knee pain. (R. 500). Dr. Ludwig ordered additional testing to confirm the in-office observations. (R. 500). A lumbar MRI performed showed disc protrusion and mild bilateral foraminal narrowing at L4-L5, broad based disc protrusion but no nerve root encroachment at L5-S1, and mild to moderate degenerative foraminal narrowing at L5-S1. (R. 491, 733). The MRI of the left knee showed lateral

patellar impingement with other complications, but no tears were observed. (R. 494, 497, 763). An EMG confirmed mild bilateral carpal tunnel syndrome, which was worse on Plaintiff's left side. (R. 494, 502, 744). At the visit following the testing, Plaintiff received an injection in her left knee. (R. 494-495). A carpal tunnel release was recommended, with the left side performed first. (R. 495). Dr. Ludwig referred Plaintiff to physical therapy. (R. 740, 779).

In January 2018, Plaintiff visited Dr. Holliday for lumbar, right hip, and right leg pain with right leg radiculopathy. (R. 1044). Dr. Holliday noted that Plaintiff would need a rollator walker to prevent falls, she should wear a back brace when not in bed, and she should avoid lifting, bending, or twisting. (R. 1046-1047). He then ordered additional testing. (R. 1047). Plaintiff underwent testing of her neck, back, and hip, and had a spinal myelogram. (R. 992-997, 999-1000, 1002). At the February 2018 appointment following the testing, Dr. Holliday recommended that Plaintiff have an anterior cervical discectomy and fusion. (R. 1042). About a year later, Plaintiff returned to Dr. Holliday for continued neck pain accompanied by left arm pain and weakness. (R. 1035). Despite the 2018 lumbar studies showing abnormalities, Dr. Holliday chose not to address the lumbar issues at that time. (*Id*.) Plaintiff's cervical myelogram showed severe left C4-C5 facet arthropathy with C5 root compression, a protruding disc with bilateral C6 root compression. (*Id*.) He attributed some of her reported weakness to past strokes. (*Id*.) He noted that attempts to treat and manage Plaintiff's symptoms conservatively had not been successful. (R. 1037). Dr. Holliday again recommended surgery. (R. 1035).

Plaintiff also received mental health treatment. Plaintiff saw Dr. Blount in late 2017 and early 2018. (Ex. B22F). She primarily complained of complications stemming from not sleeping well and hearing voices. (R. 858, 857).

Plaintiff also treated at Phoenix Center Behavioral Health (PCBH) for her mental health conditions. (Exs. B12F, B15F, B28F). At the first appointment from July 2015, Plaintiff described hearing voices, seeing dead people, and feeling sad with bouts of anxiety and panic attacks. (R. 636). Plaintiff stated that she had experienced these symptoms for 3-7 days, which led to ER visits. (R. 641). Notes describe Plaintiff as noncompliant, not doing well, angry, and sad. (R. 640). She was assessed with paranoid schizophrenia and generalized anxiety disorder. (R. 637). Plaintiff's treatment plans included goals to improve her symptoms, to function better in the community, compliance, and stabilization. (*Id.*)

The record reflects that Plaintiff stopped treating at PCBH in October 2016 due to transportation issues but visited again for counseling in March 2017. (R. 651). Plaintiff reported having been prescribed Trazodone and Zoloft for depression by Dr. Burton and being compliant with both medications. (*Id.*) Plaintiff's assessment additionally reflected a major depressive disorder diagnosis at this visit. (R. 673). Plaintiff exhibited no delusions or hallucinations, but she reported eating and sleeping issues. (R. 676). Records reflect that Plaintiff regularly treated at PCBH between April 2017 until July 2018. *See* (R. 679, Ex. B28F). Plaintiff's final visit in the record occurred a few months later in April 2019. (R. 1060-1068). Plaintiff reported doing okay and stated that she was experiencing depression. (R. 1060). Plaintiff was also having visual hallucinations with paranoia, along with eating

and sleeping issues. (*Id*.) At this last visit, during a review of Plaintiff's physical condition, her gait was noted to be within normal limits. (R. 1071).

*Consultative Examinations*

In January 2017, Dr. Chadwick provided a medical consultative examination for Plaintiff. (Ex. B10F). Plaintiff gave a history of illnesses and symptoms, which included arthritis and bulging discs, torn bilateral knee cartilage, sciatica, lupus and fibromyalgia, migraines, digestive issues, obesity and low potassium, and mental health issues. (R. 618-619). During the physical examination, Plaintiff showed decrease range of motion and tenderness in her cervical spine extending into the upper lumbar area. (R. 623). She had positive straight leg tests. (*Id*.) Dr. Chadwick could not test any hip range of motion. (*Id*.) Plaintiff was unable to bend, squat and rise, rise from sitting without assistance, or stand or hop on either foot. (*Id*.) She displayed no symptoms of lupus or digestive issues and experienced no migraines during the exam. (R. 623-624). Dr. Chadwick observed that Plaintiff's "obesity alone did not appear to affect her respirations, ambulation, and mobility." (R. 624). Dr. Chadwick relayed Plaintiff's reported history with depression, bipolar disorder, PTSD, and anxiety. (R. 624). However, he did not find Plaintiff to be affected by these issues at the exam. (*Id*.)

Dr. Chadwick concluded that Plaintiff displayed her best effort during the examination, but ultimately found that Plaintiff had mild physical limitations with sitting and moderate limitations with standing. (*Id*.) He stated that Plaintiff required an assistive device to navigate various distances and uneven ground. (*Id*.) He assessed moderate to severe limitations on Plaintiff's ability to lift and carry weight, bend, stoop, crouch, and

squat. (*Id*.)   While Dr. Chadwick suggested that Plaintiff would have manipulative limitations when reaching, he stated that there were no manipulative limitations for Plaintiff's ability to handle, feel, grasp, and finger. (*Id*.) No visual, communicative, or workplace environmental limitation were noted. (*Id.*)

Plaintiff saw Dr. Robbins-Brinson for a psychological consultative examination in February 2017. (Ex. B11F). Plaintiff described mental health concerns beginning as young as six years old and having been hospitalized twice for psychiatric treatment in 1994. (R. 632). At the time of examination, Plaintiff reported no recent psychiatric care due to a lack of transportation to appointments. (R. 631). She listed several prescribed medications but later stated that she did not find psychotropic medication helpful. (R. 631-633). She denied having any major current severe stress. (R.  632).

Plaintiff presented to the examination in pajama pants and slippers but demonstrated good hygiene. (*Id*.) Plaintiff reported living with her niece and being able to handle personal care tasks and complete household chores and tasks. (*Id*.) She described not eating or sleeping well and explained that her days consisted of watching TV despite difficulty concentrating. (*Id*.) Plaintiff stated that she could drive and that she drove herself to the exam. (R. 631, 632). Dr. Robbins-Brinson noted Plaintiff presented a depressed mood with a restricted affect. (R. 632). Plaintiff could effectively communicate despite a slow speech pattern. (*Id*.) However, Dr. Robbins-Brinson noted that Plaintiff did not appear credible, and her M-FAST score indicated possible malingering. (R.  633).

Dr. Robbins-Brinson assessed Plaintiff with major depressive disorder with anxious distress, other specific personally disorder, and malingering. Dr. Robbins-Brinson

concluded that Plaintiff could get along with others and understand and complete simple, detailed, and complex instructions. (*Id.*) Plaintiff's ability to sustain focus varied, however, with some impact on expected, timely completion of tasks. (*Id.*) Dr. Robbins-Brinson suggested that Plaintiff would be unlikely to decompensate in stressful conditions. (*Id.*)

*Treating Source Statements*

Plaintiff's primary care physician, Dr. Burton, provided a statement about her condition in October 2017. (Ex. B14F). He discussed her various symptoms and conditions before opining that Plaintiff is limited in her daily activities and unable to work on a sustained basis. (*Id.*) He also concluded that her conditions would interfere with her performance and attendance. (*Id.*)

Dr. Purselle, Plaintiff's treating physician at the Phoenix Center Behavioral Health, completed a November 2017 statement about Plaintiff's condition following his treatment for her schizophrenia and major depressive disorder. (Ex. B15F, R. 728). He stated that Plaintiff meets the criteria for disability without further explanation. (R. 728). He attributed marked or moderate limitations on Plaintiff's ability to handle instructions in a work environment and concluded that Plaintiff's decreased concentration, distractibility, and lack of motivation would additionally limit her abilities. (R. 730). Her suggested that her ability to work with the public, supervisors, and coworkers was moderately limited, as was her ability to solve problems. (R. 731).

Dr. Struth, who treated Plaintiff in 2014 for chronic pain attributed to a 2001 car accident, confirmed that he recommended a handicap parking permit because of increased difficulty walking. (R. 736).

Plaintiff's latest treating physician, Dr. Holliday, provided a letter in March 2019, outlining Plaintiff's condition and his treatment. (Ex. B27F). He attributed her pain and other symptoms to the worsening of injuries from her 2001 car accident. (R. 1057). He explained that diagnostic testing showed complications at C4-C6, with foraminal stenosis and nerve root compression at C5 and C6. (*Id.*) The studies also showed abnormalities at L4-L5 and vacuum discs at L4 and L5-S1. (*Id.*) Dr. Holliday recommended that Plaintiff undergo an anterior cervical discectomy and fusion with left-sided foraminotomies at C4-C5, C5-C6, and a right foraminotomy at C5-C6. (R. 1058). Plaintiff cancelled the surgery because of an inability to pay the insurance deductible. (*Id.*)

*Plaintiff's Function Reports and Hearing Testimony*

In October and November 2016, respectively, Plaintiff and her spouse completed function reports as a part of Plaintiff's application for benefits. (Ex. B3E, B5E). Plaintiff immediately noted her anxiety and depression by stating their effect on the way she lives, her motivation, and her ability to concentrate. (R. 265). She described having back pain, leg pain, associated muscle weakness, and complications of carpal tunnel syndrome. (*Id.*) She stated that she experienced migraines at least four times per week. (*Id.*) Plaintiff limited her daily activities to sitting in a recliner or lying down and stated she needed help with her personal care. (R. 266). She denied being able to prepare meals or complete other household chores. (R. 267-268). At the time of the report, she lived with her niece. (R. 266, 268). Plaintiff stated she was able to shop for groceries and medications, but she could only stand for less than 30 minutes. (R. 268). She also required a cane to walk. (R. 269). She checked that her conditions limited all functional areas on the report except for talking and

14

hearing. (R. 270). Plaintiff limited her lifting ability to no more than 5 pounds and her walking ability to no more than 10 minutes before needing to rest. (*Id*.) Plaintiff's husband's report reflected conditions and limitations similar to those described by Plaintiff. (Ex. B5E).

At the hearing before the ALJ, Plaintiff was 49 years old. (R. 52). She had completed 11th grade and believed she completed her GED, although that could not be confirmed. (R. 52, 72).    Plaintiff explained that she remained legally married but that they had been separated since the nineties. (R. 52). Plaintiff's son had recently moved in to help to assist her because she was unable to complete most daily chores on her own. (R. 54, 57, 63-65). Plaintiff described near constant pain and stated she was unable to undergo several procedures because she could not pay for them. (R. 55-57, 61). She severely limited her ability to walk short distances even with her cane, crouch, balance, and bend. (R. 60-63). She testified she could only lift 5-10 pounds. (R. 63). Plaintiff does not believe she would be able to work in an office or sedentary environment because of her pain and other physical and mental limitations. (R. 57-59).

## DISABILITY EVALUATION

Following the five-step sequential evaluation process, the reviewing ALJ made the following findings in this case. At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since September 28, 2016, the application and amended onset date. (R. 15, 17). At step two, the ALJ found that Plaintiff suffered from the following severe impairments: sciatica, lumbago, cervical radiculopathy, pituitary gland disorder, knee arthropathy, sleep apnea, arthralgias, myalgias, obesity, migraines, dorsalgia,

residuals of transient ischemic attacks, bilateral carpal tunnel syndrome, schizophrenia, depression, unspecified trauma and stressor-related disorder, insomnia, residuals from hiatal hernia surgery, and asthma. (R. 17). She also found that Plaintiff suffered from bronchitis, gallbladder removal residuals, cancer in remission, residuals from hysterectomy and oophorectomy, and residuals from cataract surgery, but found that these impairments were non-severe. (R. 17-18). At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments meeting or medically equaling the severity of one of the listed impairments. (R. 18-20). Therefore, the ALJ assessed Plaintiff's RFC and determined that Plaintiff could perform sedentary work, with the following limitations:

> The claimant requires the use of a cane to ambulate to and from the workstation. The claimant can occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl. She can never climb ladders, ropes, or scaffolds. The claimant can frequently handle and feel bilaterally. She can tolerate frequent exposure to extreme heat and frequent exposure to workplace hazards, including open machinery and unprotected heights. The claimant requires simple, routine work. She can tolerate frequent interaction with the general public, coworkers, and supervisors.

(R. 20).

Based on this RFC, the ALJ found at step four that Plaintiff had no past relevant work. (R. 24). The ALJ considered Plaintiff's age at the time of the decision but found that the use of a higher age category was not supported by the record. (*Id*.) Pursuant to step five, the ALJ determined that there are jobs existing which Plaintiff can perform. (R. 24-25). Following the hearing, the ALJ requested additional information from a vocational expert

by sending supplemental interrogatories. (R. 15; Exs. B21E, B22E). Following the vocational expert's initial response, the ALJ gave Plaintiff any opportunity to review the additional evidence. (Ex. B23E). Plaintiff requested that the ALJ send a second interrogatory to the vocational expert, which propounded a hypothetical encompassing the limitations suggested by several of the medical opinions and records. (Ex. B24E). The ALJ complied with Plaintiff's request and a second supplemental interrogatory was sent to the vocational expert. (Exs. B25E, B26E). The ALJ then found that Plaintiff could work at representative occupations such as call out operator, document preparer, and addresser. (R. 25). As a result, the ALJ determined that Plaintiff was not disabled within the meaning of the Social Security Act at any time from September 28, 2019, through the date of the decision. (*Id*.)

## ANALYSIS

Plaintiff argues that the ALJ erred in Plaintiff's case by improperly handling post-hearing interrogatories to the vocational expert and by failing to apply the appropriate grid rule age criteria. (Doc. 19, p. 1). Neither of Plaintiff's arguments support remanding her case to the Commissioner.

1. The ALJ did not fail to comply with appropriate procedure regarding the post-hearing interrogatories.

Plaintiff argues that the ALJ failed to follow applicable agency regulations governing post-hearing evidence when submitting the post-hearing interrogatories to a vocational expert (VE). (Doc. 19, p. 4-9). Related to this enumeration of error, Plaintiff also argues that the ALJ failed to review the medical record as a whole when formulating

Plaintiff's RFC. (*Id.*, p. 3). The record shows that the ALJ appropriately considered the medical record when formulating Plaintiff's RFC and that Plaintiff suffered no prejudice even if the ALJ failed to follow the applicable regulations governing the post-hearing VE interrogatories.

At the hearing, the ALJ proposed at least two hypotheticals, with certain modifications, to William Starke, the hearing VE. (R. 72-73). The first hypothetical limited Plaintiff to a sedentary work; using a cane to move to and from a workstation; occasionally climbing ramps and stairs, balancing, stooping, kneeling, crouching, and crawling; and never climbing ladders, ropes, or scaffolds. (R. 73). The hypothetical also allowed for frequent handling and feeling, interaction with the general public, and exposure to workplace hazards. (*Id.*) With those limitations, the VE testified that representative work was available. (*Id.*) The ALJ modified the hypothetical by keeping all other limitations the same but further limiting Plaintiff to only occasional handling and fingering. (*Id.*) Representative work remained available. (*Id.*) The ALJ then discussed the consequences of possible breaks throughout the workday and whether additional, extended breaks would preclude employment. (*Id.*)

Plaintiff's counsel proceeded to cross-examine the VE by posing additional limitations and further changing the first hypothetical posed by the ALJ. (R. 74-75). Counsel added limitations regarding stooping, kneeling, and crouching as suggested by Dr. Chadwick's consultative examination. (R. 75; Ex. B10F). With that additional limitation, gainful employment was eliminated. (R. 75). Plaintiff also questioned the VE about the impact of more extensive cane usage. (*Id.*) While the VE could not identify a specific

impact, he opined that if the cane usage caused a person to be off task greater than 10% of the workday, then competitive work would be eliminated. (*Id*.) The VE also confirmed, upon Plaintiff's counsel's questioning, that less than occasional use of the hands bilaterally would also preclude gainful employment because both hands would be needed for sedentary work. (*Id*.)

Following the hearing, on August 12, 2019, the ALJ sent an additional interrogatory to a vocational expert, Dr. Beadles, who was not the vocational expert who testified at Plaintiff's hearing. *Compare* (Ex. B21E) *and* (R. 72). The hypothetical posed in this interrogatory aligned with the first hypothetical posed at the hearing but added the limitation that a person would require "simple, routine work, performed in an environment where there are few, if any, workplace changes…." (R. 72, 348). On August 14, 2019, the VE responded that the hypothetical individual could work at representative unskilled jobs, such as a change account clerk, address clerk, and order clerk. (R. 354-356). The post-hearing interrogatory and response were provided to Plaintiff's counsel on August 15, 2019. (Ex. B23E).

Plaintiff's counsel responded on August 26, 2019, by stating that he had not received the post-hearing interrogatory before it was sent to the VE and complaining that the hypothetical presented failed to incorporate the limitations observed by the consultative examinations and other treatment providers. (Ex. B24E). He requested that the ALJ specifically review the cited records and submit another hypothetical to include all the suggested limitations, which Plaintiff urged would preclude employment. (*Id*.) A second post-hearing interrogatory was submitted to Dr. Beadles, which included additional

exhibits and a hypothetical modifying the ability to handle and feel from frequently to occasionally. (Ex. B25E). An additional question placed the hypothetical individual as being off-task more than 10% of the workday. (R. 368). The VE responded by stating that employment would be precluded by both additional limitations. (Ex. B26E). The second post-hearing interrogatory and responses were then sent to Plaintiff's counsel. (Ex. B27E). He acknowledged receiving the second, supplemental response by requesting that Plaintiff's disability benefits application be granted. (Ex. B28E). After the ALJ issued an unfavorable decision, Plaintiff sought review with Appeal Council citing the errors that she now raises. (Ex. B29E).

Plaintiff argues that the hypotheticals posed in the post-hearing interrogatories failed to incorporate all of Plaintiff's limitations and, therefore, that the resulting sedentary RFC is unsupported by the medical opinion and records. (Doc. 19, p. 4-9). She also argues that by failing to provide the interrogatories prior to sending them to the VE, the ALJ violated the procedure outlined in the Hearings, Appeals, and Litigation Law Manual ("HALLEX"). (*Id.*)  Even assuming that the ALJ violated procedures found in HALLEX, the Eleventh Circuit has indicated that such a violation "must result in prejudice before we will remand to the agency for compliance." *Carroll v. Comm'r*, 453 F. App'x 889, 892 (11th Cir. 2011) (citing *Hall v. Schweiker*, 660 F.2d 116, 119 (5th Cir. Unit A 1981)). Plaintiff argues that she was prejudiced by the ALJ's failure to set forth all of her limitations in the post-hearing hypotheticals and resulting RFC and by not being able to cross-examine the VE regarding the post-hearing interrogatories. (Doc. 19, p. 9).

Plaintiff has not shown that she was prejudiced by any procedural error. Plaintiff had the opportunity to cross examine the hearing vocational expert and respond to the responses to both post-hearing interrogatories before they were submitted to the record. None of the limitations or records that Plaintiff wanted included in a supplemental hypothetical were new as compared to the time of the hearing. Plaintiff not only had an unfettered opportunity to cross-examine the vocational expert at the hearing, but she responded to the first post-hearing interrogatory, which prompted the second post-hearing interrogatory. The post-hearing hypotheticals remained largely unchanged from the ones presented at the hearing. Nothing in the record supports a finding that the procedure used or a lack of further opportunity to question the VE prejudiced Plaintiff.

Plaintiff further contends that the hypotheticals adopted by the ALJ improperly excluded Plaintiff's limitations. This argument is also without merit and does not demonstrate prejudice. Plaintiff has not argued that the ALJ misapplied any legal standard when considering the record, but instead asserts that the RFC is not supported by the record, when considered as a whole, because the post-hearing hypotheticals did not account for all of Plaintiff's limitations. *See* (Doc. 19, p. 3, 9). As a threshold matter, the ALJ correctly identified and applied the applicable legal standards. Although Plaintiff disagrees with the ALJ's RFC determination, the decision adequately explains the ALJ's findings and conclusions.

In determining that Plaintiff was capable of a sedentary RFC, the ALJ considered the entire record. (R. 20-25). After determining that Plaintiff's medically determined impairments could reasonably be expected to produce the alleged pain and symptoms, the

ALJ found that Plaintiff's statements about the intensity, persistence, and limiting effects of her symptoms were not entirely consistent with the evidence. (R. 20). The ALJ thoroughly discussed the administrative and the treatment record and concluded that Plaintiff's "statements about the intensity, persistence, and limiting effects of [her] symptoms . . . are inconsistent because the medical record documents conservative treatment overall and benign medical status examinations." (R. 21). The ALJ examined 2016 MRI imaging studies of Plaintiff's lumbar and cervical spine (R. 733-34) that showed mild disc bulge and narrowing at L4/L5 and mild to moderate narrowing without appreciable nerve root encroachment at L5/S1. The ALJ also noted a 2016 MRI study of Plaintiff's left knee (R. 497) that showed low-grade or mild changes in the knee and 2018 MRI studies of the lumbar and cervical spine that showed a broad-based annular bulge at L4/L5 and L5/S1, with some compression of the nerve root sleeve on the left at L4/L5 (R. 997). The ALJ noted physical examinations that showed some tenderness and spasm in the cervical and lumbar spine and in the knees, requiring Plaintiff to use a cane, but further noted that Plaintiff's "pain management care was managed by her primary care provider until mid-2017." (R. 21). Nothing the ALJ summarized appears to be inconsistent with the medical record, and it is evident that the ALJ compared Plaintiff's testimony, the function report, agency summaries, and the medical record.

The ALJ articulated reasons for finding Plaintiff's testimony and description of her symptoms less persuasive, and there is no error in the ALJ's review of the record. *See Werner v. Comm'r of Soc. Sec.*, 421 F. App'x 935, 939 (11th Cir. 2011) (explaining "the question is not ... whether [the] ALJ could have reasonably credited [claimant's] testimony,

but whether the ALJ was clearly wrong to discredit it."). The ALJ clearly articulated an analysis of the objective treatment record sufficient to establish substantial evidence in support of the decision and to discount Plaintiff's subjective statements of severity. *See Brown v. Comm'r of Soc. Sec.*, 677 F. App'x 529, 531-532 (11th Cir. 2017).

Plaintiff correctly argues that an ALJ must account for all limitations in the hypotheticals and resulting RFC that are supported by the record. (*Id.*, p. 9) (citing *Stacy v. Comm'r, Soc. Sec. Admin*, 654 F. App'x 1005 (11th Cir. 2016)); *see also, Winschel*, 631 F.3d at 1180). Based on the above finding the ALJ adequately considered the record, the Court cannot find that the hypotheticals and resulting RFC – either in the initial hearing or the post-hearing interrogatories – failed to account for Plaintiff's limitations supported by the record.  Plaintiff has essentially asked the Court to reweigh the evidence. This is not the standard of review. *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005) ("We may not decide facts anew, reweigh the evidence, or substitute our judgment for that of the Commissioner"). The hypotheticals and resulting sedentary RFC are supported by substantial evidence and cannot serve to establish the prejudice required by any alleged HALLEX violation.

2.  The ALJ appropriately considered Plaintiff's age as contemplated by the applicable Grid criteria.

Plaintiff also argues that the ALJ committed reversible error by mechanically applying the age criteria as contemplated by the Medical-Vocational Guidelines, or "Grids." (Doc. 19, p. 9-11); 20 C.F.R. Part 404, Subpart P, Appendix 2. Plaintiff argues that she was in the borderline age category because she was 49 years at the time of the

hearing decision on November 14, 2019, and would turn 50 on March 9, 2020. (*Id*. p. 11). Age 50 would classify her as "closely approaching advanced age." 20 C.F.R. §§ 416.963(c)-(e). She asserts that, had the ALJ evaluated her case using the higher age category, she would have met the grid rules and been deemed disabled. (Doc. 19, p. 11). At a minimum, she asserts that the ALJ was required to apply a two-part test in Plaintiff's borderline age situation. (*Id.* p. 10).

> An ALJ may determine whether the claimant has the ability to adjust to other work in the national economy by applying the Grids or by obtaining the testimony of a vocational expert. *Winschel*, 631 F.3d at 1180. "The grids are a series of matrices which correlate a set of variables—the claimant's [RFC] (*i.e.*, the ability, despite impairments, to do sedentary, light, etc. work), age, educational background, and previous work experience. Upon the entry of a set of these variables into the appropriate matrix[,] a finding of disabled or not disabled is rendered." *Gibson v. Heckler*, 762 F.2d 1516, 1520 (11th Cir. 1985).
>
> *Huigens v. Soc. Sec. Admin, Comm'r*, 718 F. App'x 841, 845.

Plaintiff correctly argues that the age guidelines should not be applied in a mechanical way. *See*, *id.* at 846 (explaining that the Eleventh Circuit "has proscribed mechanical application of the Grids 'on the basis of a claimant's age... in a borderline situation"). Because Plaintiff was "within a few months of reaching an older age category, and using the older age category would result in a determination [of disability], [the Commissioner] will consider the use of the older age category after evaluating the overall impact of all the factors [of Plaintiff's] case." 20 C.F.R. §416.963(b). Plaintiff argues that her case presented factors such that the ALJ had to "decide whether it is more appropriate to use the claimant's chronological age or the higher age category" under HALLEX § 1-2-2-42(B). (Doc. 19, p. 10).

Plaintiff's argument overlooks two factors. First, the ALJ did recognize that Plaintiff presented a borderline age category. (R. 24). Nevertheless, he found that using the next higher age category was "not supported by the limited adverse impact of all factors on Plaintiff's ability to adjust to other work." (*Id.*) Secondly, Plaintiff's case created a situation in which using the Grids alone was not possible, and therefore, testimony from a VE was required because the ALJ found that Plaintiff was unable to perform a full range of work at the sedentary level. (R. 20-25); s*ee Huigens*, 718 F. App'x at 845 (citing *Phillips v. Barnhart*, 357 F.3d 1232, 1242 (11th Cir. 2004) (explaining "exclusive reliance on the grids is not appropriate *either* when [Plaintiff] is unable to perform a full range of work at a given residual function level *or* when [Plaintiff] has non-exertional impairments that significantly limit basic work skills)). As the ALJ explained, Plaintiff's "ability to perform all or substantially all of the requirements of [sedentary work] has been impeded by additional limitations." (R. 25). Therefore, the ALJ could not rely on the grids alone to determine disability or available employment, and the testimony of a VE was needed. *Huigens*, 718 F. App'x at 845. The ALJ followed the proper procedure.

Plaintiff has not shown that the ALJ's consideration of her age in accordance with the Grids or agency procedure was inappropriate in her case. The decision specifically shows that the ALJ recognized Plaintiff's age, and the ALJ appropriately applied the regulations and law to Plaintiff's case. There is nothing in the record to suggest that the ALJ mechanically applied the grids or inappropriately considered Plaintiff's borderline age status. Moreover, the ALJ appropriately utilized the testimony of a VE. This enumeration of error does not support remanding Plaintiff's case.

## CONCLUSION

Based on the foregoing, it is **ORDERED** that the Commissioner's decision be **AFFIRMED**.

**SO ORDERED**, this 24th day of August, 2022.

s/ Charles H. Weigle_____
Charles H. Weigle
United States Magistrate Judge